### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:05CR202** |
| vs. | ) | |
| | ) | **REPORT AND** |
| **CARRELL D. HUNTER,** | ) | **RECOMMENDATION** |
| | ) | |
| **Defendant.** | ) | |

This case is before the court on the defendant Carrell D. Hunter's MOTION TO SUPPRESS (#17). An evidentiary hearing was held on December 21, 2005. The Transcript of the proceedings (#32) was filed January 10, 2006 at which time the motion was deemed submitted.

Hunter moves the court for the suppression of evidence seized following the stop of a motor vehicle in which he was a passenger. Specifically, Hunter alleges the stop of the vehicle occurred without reasonable suspicion, that his detention and arrest occurred without probable cause, and that his custodial statements were made in violation of his *Miranda* rights. The government counters that the stop of the vehicle was stopped for the violation of a Nebraska traffic law; that the search of the vehicle was a search incident to a lawful arrest of the vehicle's driver; that the search resulted in probable cause for the arrest of Hunter; and that Hunter's statements were volunteered.

## FACTUAL BACKGROUND

Edith Anderson testified that she is an Omaha police officer and is currently assigned to the North Gang Suppression Unit. On April 9, 2005 at approximately 6:35 p.m., she and her partner, Officer Dan Williams were traveling eastbound on Hartman Avenue in an unmarked police unit. Anderson observed a red Geo Prism run the stop sign on 49th Street where it comes to a T-intersection with Hartman (4:5-20). She described the violation as a "California stop" where a vehicle brakes a little, but does not come to a complete stop as it rolls through a stop sign (4:23-5:6). She had no idea who was in the Geo, but she observed it contained two people (6:2-10).

Anderson testified that after she activated the cruiser's lights, the Geo came to a stop behind an apartment complex east of 47th Street (6:15-23). Anderson approached the driver, who identified himself as Jamal Wright (14:14-15:1). Anderson told Wright why he was stopped and asked for his identification and the paperwork on the vehicle. Wright provided her with an identification card, not a license. Anderson asked Wright if he was suspended and he indicated he was. Anderson then asked Wright to exit the vehicle, handcuffed him, and advised him that he was under arrest for driving under suspension (15:14-23).

As Anderson walked Wright to the rear of the vehicle to search him incident to the arrest, she heard Officer Williams ask the passenger, defendant Hunter, to exit the vehicle so the vehicle could be searched (14:11-17). As Anderson searched the vehicle, she noticed a white crumbly, waxy-type substance smeared on the passenger seat that she recognized as

crack cocaine (18:21-19:6). She scraped up as much of the substance as she could and put it in a plastic baggie. Using a field testing kit, she received a positive indication for cocaine (19:12-16). Anderson then informed Williams of the positive test and told him Hunter should be handcuffed and placed under arrest for possession of crack cocaine (19:20-20:7). Following their arrests, Hunter and Wright were transported to Omaha central police headquarters (20:20-21:11).

Anderson testified that during her contact with Wright, her partner Williams made contact with the passenger, the defendant, Carrell Delmar Hunter. Anderson observed Williams and Hunter and noted that Hunter appeared very nervous and asked why the vehicle was stopped. She heard Hunter as he kept "flipping back and forth" saying "what stop sign" and "we stopped at that stop sign." Anderson also heard Hunter tell Williams that he did not have identification on him and that he wanted to leave and get his identification for them (17:9-21). Anderson noted that during the contact Hunter moved back and forth, looked left and right, and was not able to sit still (18:1-6).

On cross-examination Anderson testified that when she first observed the Geo she was eastbound on Hartman (23:11-24:11) a half block or 500 feet from the intersection of 49th and Hartman, and that she could see the intersection clearly (24:7-24). She admitted that the driver of the Geo could have seen her unmarked cruiser as it came towards the intersection.

On cross-examination Anderson admitted that during the stop she did ask questions about a recent murder in the neighborhood, but she denied that it was one of the first

-3-

questions asked (29:7-16). She also denied that she could tell the race of the occupants of the Geo when it ran the stop sign, noting that she did not determine the occupants' race until she was closer to the Geo (30:1-2). She also stated that she was positive the Geo did not stop at the stop sign (30:11-13).

Dan Williams testified that he is a 13-year veteran of the Omaha police department currently assigned to the North Gang Suppression Unit (32:20-25). Williams testified that at approximately 6:35 p.m. on April 9, 2005, he was riding in a cruiser driven by Anderson near 49th and Hartman, when Anderson observed a stop sign violation (33:8-18). Williams did not see the violation as he was looking in a different direction (33:16-19).

Williams testified that after the Geo stopped, he approached and made contact with the passenger, defendant Hunter (34:10-20). He observed Hunter to be very nervous and "overly upset" as to the reason for the stop. Hunter repeatedly stated, "what stop sign?", "there is no stop sign there," and "we stopped at that stop sign." (35:1-23). Williams noted Hunter kept rocking back and forth in his seat, looking over his shoulder, and gesturing back and forth while moving his head and rocking his body. Williams asked Hunter for identification. Hunter informed him that he did not have any identification noting, however, that he lived nearby and if allowed he would go home and get his identification (36:2-20).

Williams testified that after he became aware Anderson had the driver out of the vehicle and under arrest for driving under suspension, he had Hunter exit the Geo to be patted down for weapons and so Anderson could search the vehicle (37:4-10). Hunter, who

was not handcuffed, was directed to sit on the ground.  A short time later Anderson advised Williams that she had found cocaine on the front passenger seat.  Williams recalled that as Hunter exited the Geo, he had noticed a white substance on the passenger seat, but that he did not know it was cocaine (38:24-39:5).

Williams testified that after the cocaine was located, he handcuffed Hunter and began to empty out his pockets.  In Hunter's front pants pocket Williams found a large sum of United States currency, and at that time observed Hunter's left hand out of view up underneath the tail or bottom of his shirt near the top of his pants.  After asking what he was doing, Williams pulled Hunter's hand out and observed the hand was clenched in a fist.  Between Hunter's knuckles Williams saw plastic sticking out which, upon closer inspection, appeared to be filled with crack cocaine.  Williams seized the plastic observing that it contained a fairly large rock of crack cocaine (39:21-40:9).

Williams testified that after the arrest, Hunter was taken to the Omaha Police Department jail and placed in an interview room (41:11-15) where Williams attempted to interview Hunter.  As Williams informed Hunter that he was under arrest for possession with intent to deliver crack cocaine, Hunter interrupted and objected that he doesn't sell crack, that he's just a smoker of crack cocaine (42:12-17).  Williams cut Hunter off and said, "Well we know that's not true because of the quantity of the crack cocaine in your possession.  It's not consistent with just a smoker's amount."  Williams then told Hunter that he had options, that he would be able to tell the police everything he knows about his involvement with crack

cocaine; however, Hunter again interrupted stating, "I don't know anything about crack cocaine, I'm just a drug addict – I smoke it." Williams cut Hunter off and told him, "Well hold on, hear me out," and he told Hunter that if he was willing to work with the police, they were willing to work with him. Hunter told Williams he had just purchased the crack cocaine found on his person for $100 from some kid. Williams responded, "Well, I know that's not true because nobody would sell that amount of crack for $100." Williams then read Hunter his *Miranda* warnings and Hunter invoked his rights (42:21-43:16).

Williams testified that he usually tries to explain to defendants their situation and let them know somewhat what the focus of the interview was going to be. Williams added that he usually conducts interviews in the same way every time and that he tries to get the defendant to relax before he Mirandizes them because he has learned "if you Mirandize them right away, they're going to automatically say no." (43:21-44:2).

Williams admitted that while Hunter was outside the Geo, he did ask him about a homicide that had occurred a couple of blocks from the stop (45:4-13).

On cross-examination Williams testified that as he and Anderson were eastbound on Hartman when Anderson stated, "well, they just ran the stop sign," and that he looked up and observed a red Geo Prism about a half-block away on 49th (46:8-21). Williams noted that there were no cars between the cruiser and the Geo and that he first noticed the occupants of the Geo were African-American when he approached the Geo after it stopped (48:20-25).

## LEGAL ANALYSIS

### A.  Legality of Traffic Stop.

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001); *see United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001), *cert. denied*, 537 U.S. 850 (2002).  As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968).  *Jones*, 269 F.3d at 924.  Under *Terry*, 392 U.S. at 21-22, a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity.  *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979).  Reasonable suspicion requires a particularized and objective basis for suspecting the person stopped of criminal activity, but the level of suspicion required for a *Terry* stop is less demanding than that for probable cause.  *United States v. Gonzalez*, 220 F.3d 922, 925 (8th Cir. 2000) (internal quotations and citations omitted).  "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1999).  Even "[a] mistaken premise can furnish grounds for a Terry stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." *United States v. Ornelas-Ledesma*, 16 F.3d 714, 718 (7th Cir. 1994), *judgment vacated on other grounds*, 517 U.S. 690 (1996) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 184-86 (1990)); *accord United States v. Bailey*, 417 F.3d 873, 977 (8th Cir. 2005);

*see also United States v. DeLeon-Reyna*, 930 F.2d 396, 399 (5th Cir. 1991) (en banc) (per curiam); and *United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989)).

In this case, Anderson testified that she observed a Geo run the stop sign at 49th and Hartman. I find Anderson's testimony to be credible and I find she had a reasonable basis for stopping the Geo.

### B.  The Search of the Geo.

In *New York v. Belton*, 453 U.S. 454, at 460 (1981), the Supreme Court held, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." The Court observed that although it was settled that the police, to protect officer safety and preserve evidence, may search the person of an arrestee and the area within his immediate control, *see Chimel v. California*, 395 U.S. 752 (1969); *United States v. Robinson*, 414 U.S. 218 (1973), no straightforward rule had emerged concerning searches incident to the arrest of occupants of an automobile. The court then identified the problem with the extant state of affairs: "When a person cannot know how a court will apply a settled principle to a reoccurring factual situation, that person cannot know the scope of his constitutional protection, nor can a policeman know the scope of his authority." *Belton*, 453 U.S. at 459-60.

To establish a workable rule, the court relied on the "generalization" that articles inside the passenger compartment of an automobile are generally, if not inevitably, within

the area into which an arrestee might reach to grab a weapon or evidence.  Thus, the Court held that the police, incident to an arrest, may search the passenger compartment of an automobile, and all containers within that compartment.  *Id*. at 460.  *See also United States v. Wells*, 347 F.3d 280 (8th Cir. 2003), *cert. denied*,  541 U.S. 1081 (2004); *United States v. Orozco-Castillo*,  404 F.3d 1101 (8th Cir. 2005).

Under the facts of this case, after making a lawful stop of the Geo for running a stop sign, Anderson arrested the driver for driving under suspension.  Because the cocaine was located in the passenger area and clearly where the driver could reach and grab the evidence, the bright-line rule of *Belton* clearly applies even though the occupants had been removed from the Geo.  *United States v. McCrady*, 774 F.2d 868, at 871-72 (8th Cir. 1985).  The search of the vehicle was "contemporaneous to the arrest," *see United States v. Wells*, 347 F.3d at 287, and was permissible under *New York v. Belton*.

### C. Hunter's Pre-*Miranda* Statements.

In this case *Miranda* rights were read to Hunter and he invoked his rights.  However, prior to being informed of his rights, he was subjected to words and contact with law enforcement that officers should have known was reasonably likely to elicit incriminating responses.

There can be no question that *Miranda* applies because Hunter was in custody during his verbal exchanges with Williams.  The question is whether Hunter's statements were spontaneous or whether they were admissions induced by the investigating officer.  The

touchstone for the admissibility of a defendant's statement is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936). The court must look to the totality of the circumstances in determining whether or not the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

"A *Miranda* warning must precede any custodial interrogation. A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). However, "[i]nterrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989) (quotation omitted).

Based upon the facts of this case, I find that the government has failed to prove by a preponderance of the evidence that Hunter's pre-*Miranda* statements were not induced by the actions of the investigating officer. The verbal exchange between Williams and Hunter was clearly initiated by Williams, who should have known that his statements to Hunter (along

with his challenges to Hunter's claims) were reasonably likely to elicit incriminating responses from Hunter.

## RECOMMENDATION

For these reasons,

**IT IS RECOMMENDED** that defendant's Motion to Suppress (#17) be granted in part and denied in part, as follows:

1. The Motion should be denied as to the stop and search of the Geo in which Hunter was a passenger.

2. The motion should be granted as to statements made by Hunter at the Omaha Police Department jail before Hunter was given his *Miranda* rights.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.

**DATED January 27, 2006.**

                                               **BY THE COURT:**

                                               **s/ F.A. Gossett**
                                               **United States Magistrate Judge**